**O**

# United States District Court
# Central District of California

| | |
|---|---|
| POLARIS POWERLED TECHNOLOGIES, LLC,<br>Plaintiff,<br>v.<br>WESTERN DIGITAL CORPORATION et al.,<br>Defendants. | Case № 2:24-cv-02864-ODW (MARx)<br><br>**ORDER RE CLAIM CONSTRUCTION** |

## I. INTRODUCTION

Plaintiff Polaris PowerLED Technologies, LLC brings this patent infringement suit against Defendants Western Digital Corporation and Western Digital Technologies, Inc. (collectively, "Western Digital"). (First Am. Compl. ("FAC"), Dkt. No. 40.) Polaris alleges Western Digital infringed three patents: U.S. Patent Nos. 8,554,968 (the "'968 Patent"); 9,183,085 (the "'085 Patent"); and 8,601,346 (the "'346 Patent"). (*Id.* ¶ 1.) The parties now ask the Court to construe seven claim terms from the '968 and '085 Patents. (Opening Claim Construction Br. ("Opening Br.") 1, Dkt. No. 111.) On July 20, 2026, the Court heard from the parties regarding the disputed terms. (Mins., Dkt. No. 122; Hr'g Tr., Dkt. No. 126.) This claim construction order defines those terms.

## II. BACKGROUND

### A. Factual and Procedural Background

Polaris is a California limited liability company that "owns the entire right, title, and interest" in the patents-in-suit. (FAC ¶¶ 7, 34–36.) The patents-in-suit relate to memory controllers, flash memory, and data-stripe operation systems. (*Id.* ¶¶ 37, 42, 56.) Polaris alleges that Western Digital manufactured products that infringe on the patents-in-suit.[1] (*Id.* ¶¶ 1, 3.)

On April 9, 2024, Polaris initiated this patent infringement action against Western Digital and several other customer defendants. (Compl., Dkt. No. 1.) After amendment and on an unopposed motion, the Court severed the customer defendants, leaving only Western Digital. (Order Sever 2, Dkt. No. 50.)

Between January 23 and January 29, 2025, Western Digital filed three petitions for *inter partes* review ("IPR") with the Patent Trial and Appeal Board ("PTAB")—one for each of the patents-in-suit—challenging "all claims that Polaris currently asserts in this litigation." (Order Grant Stay 2, Dkt. No. 68.) In light of the IPR proceedings, the Court stayed the action pending PTAB's rulings. (*Id.* at 9.) After PTAB denied Western Digital's IPR petitions and the Federal Circuit denied Western Digital's petition for a writ of mandamus, the Court lifted the stay in this action. (Min. Order, Dkt. No. 79.)

### B. The Patents at Issue

Two patents are at issue in this claim construction: the '968 Patent and the '085 Patent. (Opening Br. 1.) The parties do not dispute the terms in the third patent, the '346 Patent. (*Id.* at n.2.) Both patents at issue relate to solid state drives ("SSDs"), which utilize flash, nonvolatile memory.

---

[1] On April 3, 2026, Western Digital moved to substitute Sandisk Corporation and Sandisk Technologies, Inc. (collectively, "Sandisk"), or at a minimum, to join Sandisk and stay the proceedings as to Western Digital. (Mot. Substitute, Dkt. No. 95.) Western Digital argues substitution is proper because Western Digital spun off its flash memory business to Sandisk and Sandisk agreed to indemnify Western Digital in this litigation. (*Id.* at 1.) The motion is fully briefed and the Court has taken it under submission.

*1. ’968 Patent*[2]

The ’968 Patent is formally titled “Interrupt technique for a nonvolatile memory controller.”

In general terms, a nonvolatile memory controller is the “brain” inside the SSD that manages how data is written, read, saved, and erased. The ‘968 Patent describes an improved nonvolatile memory controller that can process data without constant interruption to its host processing unit, especially because modern computers are processing large amounts of data at once. Without this technology, the host processing unit must repeatedly poll the SSD to ensure that work has been completed, consuming the host processing unit’s resources.

Specifically, as described in the ’968 Patent, an “interrupt manager” in the nonvolatile memory controller monitors outstanding tasks in the host processing unit’s completion queue (such as saving a piece of data). When a task is complete, the interrupt manager detects an “unprocessed completion status” in the host processing unit’s completion queue. Depending on a number of considerations, including “completion queue events” and “interrupt vector states,” the interrupt manager selectively sends an “interrupt message packet” to the host processing unit notifying it of a group of unprocessed completion statuses. This alleviates the burden on the host processing unit that would otherwise have to constantly poll the completion queue for unprocessed completion statuses.

*2. ’085 Patent*[3]

The ’085 Patent is formally titled “Systems and methods for adaptively selecting from among a plurality of error correction coding schemes in a flash drive for robustness and low latency.”

---

[2] Unless otherwise noted, all cites in this section are to the ’968 Patent. (Decl. Jeffrey D. Ahdoot ISO Opening Br. (“Ahdoot Decl.”) Ex. A (“’968 Patent”), Dkt. No. 111-2.) Subsequent cites are to the patent’s column number and line number.

[3] Unless otherwise noted, all cites in this section are to the ’085 Patent. (Ahdoot Decl. Ex. B (“’085 Patent”), Dkt. No. 111-3.) Subsequent cites are to the patent’s column number and line number.

Over time, SSDs degrade and make more errors. To fix those errors, an SSD controller uses an "Error Correction Code," or ECC, to fix those mistakes and recover lost data. The '085 Patent describes a system that chooses from different ECCs, or "gears," depending on the bit error rate ("BER") it observes. When the system observes a higher BER (meaning higher degradation), it selects a corresponding gear that provides greater error-correction capabilities but reduces available storage. When the system observes a lower BER, it selects a corresponding gear that provides fewer error-correction capabilities but more storage.

## III. LEGAL STANDARD

Claim construction is an interpretive matter "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). When construing claims, courts "must begin and remain centered on" the claim language itself. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Rexnord Corp. v Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001) ("We begin our claim construction analysis as it always should: with the language of the claims."). This process involves an analysis of how a person of ordinary skill in the art ("POSITA") would interpret the relevant terms considering both the claim in which the terms appear and of the entire patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Claims must be read in light of the specification, which is "always highly relevant to the claim construction analysis." *Id.* at 1315 (citation modified). However, it is improper to read limitations from the specification into the claim. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005); *see also Phillips*, 415 F.3d at 1323 ("[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a [POSITA] would understand the claims terms."). Courts may consult extrinsic evidence "if needed to assist in determining the

meaning or scope of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995).

## IV. '968 PATENT CONSTRUCTION

The parties dispute five terms in the '968 Patent: (1) the preamble to Claim 1; (2) "interrupt manager"/"interrupt manager controller"; (3) part of the body of Claim 1; (4) part of the body of Claim 8; and (5) part of the body of Claim 16.[4] (Opening Br. 4–21; Resp. Br. 4–20, Dkt. No. 113.)

### A. Preamble (Claim 1)

**Disputed Term**: "A nonvolatile memory controller for alerting a host processing unit to an unprocessed completion status contained in a completion queue of the host processing unit, the nonvolatile memory controller comprising . . ."

| Polaris's Construction | Western Digital's Construction | The Court's Construction |
|---|---|---|
| The preamble is not limiting other than the phrase "nonvolatile memory controller," which should be given its plain and ordinary meaning. | The preamble is limiting. | The preamble is not limiting other than the phrase "nonvolatile memory controller," which should be given its plain and ordinary meaning. |

The first disputed term is the preamble to Claim 1. "If a preamble recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim, then the preamble can limit the scope of a claim." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (citation modified). A preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). "Reliance on a preamble phrase for antecedent

[4] The parties initially disputed the terms "completion queue state" and "interrupt vector state"; however, after the claim construction hearing, the parties resolved their disputes over the two terms. (Joint Status Rep., Dkt. No. 132.) The Court appreciates the parties' professionalism and willingness to cooperate, as well as their compelling arguments at the claim construction hearing.

basis, however, may limit claim scope." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1369–70 (Fed. Cir. 2020).

Polaris argues that the preamble is not limiting because it simply describes the intended purpose of the claim. (Opening Br. 5.) Specifically, Polaris notes that the claim's body "recites a structurally complete invention, and there is nothing in the preamble that is necessary to complete that structure." (*Id.*) Western Digital argues that the preamble supplies an antecedent basis for the claim body. (Resp. Br. 4.) Western Digital notes that, while the preamble uses indefinite articles ("*a* nonvolatile memory controller" and "*an* unprocessed completion status"), the claim uses definite articles ("*the* nonvolatile memory controller" and "*the* unprocessed completion status"). (*Id.*) Western Digital also points to the '968 Patent's specification, which illustrates a "controller-host interaction [that] is precisely what the preamble describes," indicating that the preamble "is a 'necessary component of the claimed invention.'" (*Id.* at 5 (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003)).)

The Court adopts Polaris's construction and finds that the preamble of Claim 1 is not limiting. The preamble does not "recite essential structure or steps," nor is it "necessary to give life, meaning, and vitality to the claim." *TomTom, Inc.*, 790 F.3d at 1323 (citation modified). Instead, the preamble simply describes, at a high level, the claim that follows. The preamble states that the purpose of the nonvolatile memory controller is to "alert[] a host processing unit to an unprocessed completion status contained in a completion queue of the host processing unit." ('968 Patent 29:23–26.) Meanwhile, the claim itself describes *how* the nonvolatile memory controller "alert[s] the host processing unit of the unprocessed completion status," (*id.* at 29:35–36), providing the "essential structure or steps" to how the claim fulfills the purpose described in the preamble, *TomTom*, 790 F.3d at 1323.

The language of the preamble and the claim confirm this construction. The first clause of the preamble, beginning with "[a] nonvolatile memory controller,"

('968 Patent 29:23), provides an antecedent basis[5] for "*the* nonvolatile memory controller" that the claim further describes, (*id.* at 29:25–26). The claim description is also self-contained: it fully describes the nonvolatile memory controller and how and when the nonvolatile memory controller "alert[s] a host processing unit to an unprocessed completion status." (*Id.* at 29:23–42.) Nothing in the preamble is necessary to understand the process described in the claim. Indeed, the claim body repeats the preamble, further demonstrating that the preamble is not "necessary to give life, meaning, and vitality to the claim." *TomTom, Inc.*, 790 F.3d at 1323 (citation modified); (*compare* '968 Patent 29:23–25 ("alerting a host processing unit to an unprocessed completion status in a completion queue"), *with id.* 29:35–27 ("to alert the host processing unit of the unprocessed completion status in the completion queue").)

Western Digital's arguments to the contrary are unavailing. First, Western Digital argues that, because the preamble exclusively uses indefinite articles, it must provide a limitation to the body of the claim because the body uses definite articles. (Resp. Br. 4.) According to Western Digital, "[w]ithout those preamble terms, the corresponding claim-body references would lack antecedent basis." (*Id.* (citing *Bio-Rad Lab'ys*, 967 F.3d at 1369, 1371–72).) However, "simply because a preamble appears to contain an 'antecedent basis' for a term mentioned in the body of a claim is no guarantee that the preamble is limiting." *Univ. of S. Fla. v. United States*, 137 Fed. Cl. 658, 671 (2018) (citing *Eaton Corp.*, 323 F.3d at 1339). Rather, "[t]he preamble language must still supply some additional, vital information that is missing from the body of the claim for that particular guideline to apply." *Id.* (citing *TomTom, Inc.*, 790 F.3d at 1322–24). Here, the antecedent terms other than "nonvolatile memory controller"—including "a host processing unit" and "an unprocessed completion status"—do not "supply some additional, vital information that is missing from the

[5] An antecedent basis is a "general word or phrase in a patent claim or description to which a later specific word or phrase must refer." *Antecedent Basis*, Black's Law Dictionary (12th ed. 2024).

body." *Id.* Rather, they only help to illustrate the purpose of the nonvolatile memory controller, a term that is limited and that the preamble announces.

Second, Western Digital argues that the specification "confirms that the preamble does not merely recite incidental words of intended use" because the specification describes the same process as the preamble. (Resp. Br. 5.) This argument only highlights why the preamble is not limiting. While the specification describes the same process as the preamble—the "controller-host interaction"—the claim body also describes the same process. Indeed, the claim body goes into further detail about the "controller-host interaction" than the preamble does. Thus, the preamble is not "necessary to give life, meaning and vitality to the claim," nor does it describe something "essential" that the specification does not already describe. *TomTom, Inc.*, 790 F.3d at 1323.

For these reasons, the Court adopts Polaris's construction that the preamble to Claim 1 is not limiting, except as to the term "nonvolatile memory controller."

### B. "Interrupt Manager" / "Interrupt Manager Controller" (Claims 1, 6, 7, 8, 9, 10, 14, 15)

**Disputed Term:** "Interrupt Manager" and "Interrupt Manager Controller"

| **Polaris's Construction** | **Western Digital's Construction** | **The Court's Construction** |
|---|---|---|
| Plain and ordinary meaning, which is hardware and/or software configured to generate an interrupt message packet for triggering an interrupt in the host processing unit to alert the host processing unit of an unprocessed completion status. | Hardware and/or software within the nonvolatile memory controller for alerting the host processing unit to an unprocessed completion status. | Hardware and/or software within the nonvolatile memory controller for alerting the host processing unit to an unprocessed completion status. |

The second disputed term is "interrupt manager" or "interrupt manager controller." The parties do not dispute that the interrupt manager means hardware and/or software designed to "alert the host processing unit of an unprocessed completion status." (Opening Br. 6–7; Resp. Br. 6.) The parties do dispute whether to include language about how the interrupt manager alerts the host processing unit ("configured to generate an interrupt message packet for triggering an interrupt in the host processing unit"). (Opening Br. 6–7; Resp. Br. 8.) The parties also dispute whether the interrupt manager is located "within the nonvolatile memory controller." (Opening Br. 8; Resp. Br. 6–8.)

First, the parties dispute whether the interrupt manager is "configured to generate an interrupt message packet for triggering an interrupt in the host processing unit." Polaris points to the claim language and the specification, both of which also state that the interrupt manager is configured in the above manner. (Opening Br. 7–8.) Western Digital does not dispute that the claim body includes this language, arguing only that the language is redundant. (Resp. Br. 8.)

The Court finds Western Digital's construction more persuasive and declines to include the additional language. "Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016). Here, the language Polaris proposes is lifted almost verbatim from the body of Claims 1 and 8. ('968 Patent 29:34–36; 30:25–29.) It is unnecessary and redundant to construe this term in this way. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("[Claim construction] is not an obligatory exercise in redundancy.").

Second, the parties dispute whether the Court should construe the interrupt manager as "within the nonvolatile memory controller." Polaris argues that this construction is both unnecessary and invites ambiguity, as parties could "later dispute what counts as being 'within' the controller." (Opening Br. 8.) Western Digital

argues that the "specification's consistent description of the interrupt manager as existing within the nonvolatile memory controller defines this term 'by implication.'" (Resp. Br. 6.)

Further, the Court adopts Western Digital's construction and construes interrupt manager as "within the nonvolatile memory controller." As an initial matter, the claims themselves provide little help as they neither require nor foreclose such a construction. For example, while Claim 1 states that the nonvolatile memory controller is "comprising," among other things, an interrupt manager, ('968 Patent 29:26–27), it does not expressly state that every component of the interrupt manager must be "within" the nonvolatile memory controller.

However, the specification "provides guidance as to the meaning" of interrupt manager. *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citation modified). As noted earlier, a court may not read limitations from the specification into claims. *Callicrate*, 427 F.3d at 1368. However, claims must still "be construed in light of the specification." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–41 (Fed. Cir. 2001). The Federal Circuit has recognized that this potential incongruity creates a "fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). To walk this fine line, the Federal Circuit has held that a specification "can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *SciMed*, 242 F.3d at 1344. Specifically, a patentee can define a term "by implication" if she "uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning." *Bell Atl.*, 262 F.3d at 1271.

After examining the specification, the Court finds that the '968 Patent's specification consistently defines interrupt manager as "within the nonvolatile

memory controller." As Western Digital notes, the specification repeatedly states that the interrupt manager is "*in*" the host controller interface of the nonvolatile memory controller. (Resp. Br. 6; *see, e.g.*, '968 Patent 22:17–18, 28:18–19, 28:64–65.) The use of the word "in" indicates that the interrupt manager must be fully within the host controller interface, which itself is fully within the nonvolatile memory controller. *See CliniComp Int'l, inc. v. Cerner Corp.*, No. 17-cv-02479-GPC (DEB), 2022 WL 16985003, at *10 (S.D. Cal. Nov. 15, 2022) ("The plain and ordinary meaning of the word 'in' . . . is to indicate 'location or position within something.'"); *see also In*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/in (last visited July 15, 2026) (defining "in" as "used as a function word to indicate inclusion, location, or position within limits"). Additionally, nowhere in the specification does it describe the interrupt manager as existing anywhere other than "in" the nonvolatile memory controller.

Polaris urges the Court to ignore the specification, arguing that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." (Reply Br. 4, Dkt. No. 116 (citing *Phillips*, 415 F.3d at 1323).) True. However, the patent here describes "various embodiments," not just one. ('968 Patent 1:39.) And Polaris cannot point to any embodiment that contemplates an interrupt manager with any of its components extending outside a nonvolatile memory controller. Thus, "upon reading the specification," the Court finds that the '968 Patent patentee is not simply "setting out specific examples of the invention to" teach other POSITAs, but rather "intends for the claims and the embodiments in the specification to be strictly coextensive." *Phillips*, 415 F.3d at 1323 (citing *Snow v. Lake Shore & M.S. Ry. Co.*, 121 U.S. 617, 630 (1887) (finding nothing in the specification "to indicate that the patentee contemplated any alternative" embodiment)).

The extrinsic evidence also supports Western Digital's argument and ultimate construction. Western Digital proffers the testimony of Dr. Tajana Rosing, a

Professor and Chair in the Department of Computer Science and Engineering and Department of Electrical and Computer Engineering at the University of California, San Diego. (Decl. Dr. Tajana Rosing ISO Resp. Br. ("Rosing Decl.") ¶¶ 5–7, Dkt. No. 114-1.) According to Dr. Rosing, "a POSITA would understand that all functions in the claims performed by the 'interrupt manager' or 'interrupt manager controller' must be performed within the nonvolatile memory controller." (*Id.* ¶ 22.) She persuasively walks through various figures in the specification, explaining how a POSITA, reading the claims in light of the specification, can only be left with the understanding that the interrupt manager must be within the nonvolatile memory controller. (*Id.* ¶¶ 22–32.) Conversely, Polaris's expert—Dr. John Berg, a technical consultant—does not address Western Digital's construction and whether a POSITA would understand that the interrupt manager must be within the nonvolatile memory controller. (*See generally* Decl. Dr. John Berg ISO Opening Br. ("Berg Decl."), Dkt. No. 111-7.)

For these reasons, after weighing the intrinsic and extrinsic evidence, the Court adopts Western Digital's construction, that the interrupt manager must be "within the nonvolatile memory controller," and reject Polaris's construction.

**C. Body (Claim 1)**

**Disputed Term:** "generate a completion queue state for indicating the occurrence of a completion queue event associated with the completion queue, generate an interrupt vector state based on the completion queue state, determine the completion queue of the host processing unit contains an unprocessed completion status based on the interrupt vector state, and generate an interrupt message packet for triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue . . ."

| Polaris's Construction | Western Digital's Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Steps must be performed in order. | Steps must be performed in order. |

The third disputed term is the body of Claim 1. It consists of four independent clauses, each of which start with the verb "generate" or "determine." ('968 Patent 29:29–37.) Polaris argues that the Court should give the term its plain and ordinary meaning, without requiring that each step is performed one after another. (Opening Br. 14–18.) Western Digital argues that the structure of the claim body and the specification compel the conclusion that the steps must be performed in order. (Resp. Br. 13–18.)

"As a general rule, unless the steps of a [system claim] actually recite an order, the steps are not ordinarily construed to require one."[6] *Sound View Innovations, LLC v. Hulu, LLC*, 166 F.4th 958, 965 (Fed. Cir. 2026) (citation modified). "However, a claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398–99 (Fed. Cir. 2014) (citation modified).

Claim 1 requires, as a matter of grammar, ordering of steps. "Subsequent use of the definite article[] 'the' . . . in a claim refers back to the same term recited earlier in the claim." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016). Here, the first clause states that the interrupt manager will "generate *a* completion queue state." ('968 Patent 29:27–28 (emphasis added).) However, the second clause states that the interrupt manager will "generate an interrupt vector state based on *the* completion queue state." (*Id.* at 29:30–31 (emphasis added).) Thus, "*the* completion queue state," as used in the second clause, must be referring to the same completion queue state described in the first clause. Similarly, the second clause uses an indefinite article with "*an* interrupt vector state," while the third clause uses a definite article to

[6] *Sound View* dealt with method claims, while Claims 1 and 8 are both system claims. However, as both parties acknowledge, courts have applied the legal analysis for whether sequence is required in steps of method claims to similar language in system claims. (*See* Opening Br. 15 n.4; Resp. Br. 14 n.1 (both citing *Avago Techs. Gen. IP (Singapore) Pte Ltd. v. Asustek Computer, Inc.*, No. 15-CV-04525-EMC, 2016 WL 3029674, at *12 (N.D. Cal. May 27, 2026)).)

refer to "*the* interrupt vector state." (*Id.* at 29:29–33 (emphasis added).) And the third clause refers to "*an* unprocessed completion status," while the fourth clause refers to "*the* unprocessed completion status." (*Id.* at 29:32–36 (emphasis added).) Each transition from an indefinite article to a definite article further confirms an antecedent relationship between each clause to its subsequent clause. *See Antecedent Basis*, Black's Law Dictionary (12th ed. 2024) (explaining that, in a patent context, one finds antecedent basis when "a term is first introduced with an indefinite article and is later referred to with the definite article"). And as antecedent relationships exist throughout the claim, there must be an order. *See Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 701 (2024) ("[T]he antecedent relationship implies a sequence as a matter of grammar . . . .").

Logic compels the same conclusion. The first clause states that the interrupt manager will "generate a completion queue state." ('968 Patent 29:27–28.) The second clause states that the interrupt manager will generate an interrupt vector state "*based on* the completion queue state." (*Id.* at 29:30–31.) As the interrupt vector state depends on the completion queue state, this necessarily means that the interrupt manager must first generate the completion queue state before generating the interrupt vector state. Same with the second and third clauses: the second clause states that the interrupt manager will "generate an interrupt vector state," while the third clause states it will determine the completion queue "*based on* the interrupt vector state." (*Id.* at 29:29–33.) One must come after the other: the claim expressly contemplates that the interrupt manager generates the completion queue *after* generating an interrupt vector state because the completion queue is *based on* the interrupt vector state. In the context of the claim, it would make little sense if the interrupt manager could generate a completion queue before generating an interrupt vector state.

As the Court "conclude[s] that the claim language demonstrates the order of the steps, [it] need not look further into the specification." *Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021). The Court adopts

Western Digital's construction and construes the body of Claim 1 to require that the steps be performed in order.

**D. Body (Claim 8)**

**Disputed Term:** "map at least one completion queue state of the plurality of completion queue states to an interrupt vector state of the plurality of interrupt vector states, generate the interrupt vector state based on each completion queue state mapped to the interrupt vector state, determine a completion queue corresponding to a completion queue state mapped to the interrupt vector state contains an unprocessed completion status based on the interrupt vector state, and to generate an interrupt message packet based on the interrupt vector state for triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue."

| Polaris's Construction | Western Digital's Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Steps must be performed in order. | Steps must be performed in order. |

The fourth disputed term is part of the body of Claim 8. The parties' dispute over Claim 8 largely tracks their dispute over Claim 1. Specifically, Polaris argues that the steps in Claim 8 need not be performed in order, while Western Digital argues that the grammar and logic of Claim 8 require that the steps be performed in order. (Opening Br. 19–20; Resp. Br. 18–20.)

For the same reasons as in Claim 1, the Court finds that the steps in Claim 8 must be performed in order. First, the grammar used in the claim compels the conclusion that the steps must be performed in order. As in Claim 1, the alternating use of indefinite articles followed by definite articles demonstrates an antecedent relationship, and therefore, an order of steps. Specifically, the first clause sets forth "*an* interrupt vector state," while the second clause sets forth "*the* interrupt vector state." ('968 Patent 30:18–20 (emphasis added).) Similarly, the third clause sets forth

"*an* unprocessed completion status," while the fourth clause sets forth "*the* unprocessed completion queue." (*Id.* at 30:23–29.) As an antecedent relationship exists between these clauses, there must also be an order.

Second, logic also compels the same conclusion. Specifically, step 4 cannot happen without step 3. Step 3 requires the interrupt manager controller to "determine" whether a completion queue "contains an unprocessed completion status" exists. (*Id.* at 30:21–24.) Step 4 then requires the interrupt manager controller to "generate an interrupt message packet" to "alert the host processing unit of the unprocessed completion status." (*Id.* at 30:25–29.) Without first determining, in step 3, that an unprocessed completion status exists, the interrupt manager controller cannot logically "alert the host processing unit of the unprocessed completion status." Thus, there must be an order of steps in Claim 8.

While Polaris points to the specification to argue that the Court should construe the term according to its plain and ordinary meaning, (Opening Br. 19–20), as with Claim 1, the Court declines to "look further into the specification," *Hytera*, 841 F. App'x at 218.

For these reasons, the Court adopts Western Digital's construction and construes the body of Claim 8 to require that the steps be performed in order.

**E. Body (Claim 16)**

**Disputed Term:** "generating a completion queue state by a nonvolatile memory controller for indicating the occurrence of a completion queue event associated with a completion queue in a host processing unit, . . . generating an interrupt vector state by the nonvolatile memory controller based on the completion queue state, the interrupt vector state associated with an interrupt vector in the host processing unit; determining by the nonvolatile memory controller based on the interrupt vector state that the completion queue contains an unprocessed completion status; and generating an interrupt message packet by a nonvolatile memory interface

for triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue."

| Polaris's Construction | Western Digital's Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning. | Steps must be performed in order. | Steps must be performed in order. |

The fifth disputed term is the body of Claim 16. As both parties acknowledge, Claim 16 is a method claim that is substantively identical to Claim 1, which is a system claim. (Opening Br. 21; Resp. Br. 20.) Thus, for the same reasons as Claim 1, the Court adopts Western Digital's construction and construe the body of Claim 16 to require that the steps be performed in order.

## V. '085 PATENT CONSTRUCTION

The parties dispute two terms in the '085 Patent: (1) "gear," and (2) "Error correction coding (ECC) schemes." (Opening Br. 21–25; Resp. Br. 20–25.)

### A. "Gear" (Claims 1 & 15)

**Disputed Term**: "gear"

| Polaris's Construction | Western Digital's Construction | The Court's Construction |
|---|---|---|
| Plain and ordinary meaning, which is a set of parameter(s) specifying an error correction coding scheme, including one or more of the payload capacity, the type and parameters of each component code, the interleaving scheme, and parameters used for determining whether the gear is appropriate for a particular situation. | A set of predefined error correction coding parameters providing a level of error correction coding strength. | Plain and ordinary meaning, which is a set of parameter(s) specifying an error correction coding scheme, including one or more of the payload capacity, the type and parameters of each component code, the interleaving scheme, and parameters used for determining whether the gear is appropriate for a particular situation. |

The sixth disputed term (and first disputed term of the ’085 Patent) is “gear.” Polaris’s proposed construction appears as a passage in the specification, (’085 Patent 20:18–24), and thus, Polaris argues that it “must be adopted under controlling law,” (Opening Br. 22). Western Digital does not dispute that Polaris’s proposed construction appears in the specification; instead, it argues that the proposed construction is imprecise and circular. (Resp. Br. 20–22.)

When a “patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term . . . the definition selected by the patent applicant controls.” *Renishaw PLC v. Marposs Societa’ per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). “The intrinsic evidence must clearly set forth or clearly redefine a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term.” *Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025) (citation modified). For example, courts have found lexicography when a patentee defines terms in a specification under the heading “defined below.” *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Courts have also found lexicography when a term is set off with quotation marks, as it is “often a strong indication that what follows is a definition.” *Sinorgchem Co., Shandong v. Int’l Trade Comm’n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).

Here, the specification’s treatment of “gear” must be given definitional weight because it clearly, deliberately, and precisely sets out that it intended to define “gear.” *See Renishaw*, 158 F.3d at 1249 (requiring that lexicography appear with “reasonable clarity, deliberateness, and precision”). First, the patentee’s definition of gear, used verbatim by Polaris as a proposed construction, “appears under the title ‘Definitions,’” demonstrating the patentee’s intention to define gear. *Alnylam Pharms.*, 138 F.4th at 1133; (’085 Patent 19:10, 20:18–24). Second, in the “Definitions” section, the specification sets off the word gear with quotes, indicating that what follows “gear” is its definition. *Sinorgchem*, 511 F.3d at 1136; (’085 Patent 20:18). Taken together,

these characteristics demonstrate that the passage in the specification regarding "gear" is definitional and controls.

Perhaps recognizing that it misunderstood *Renishaw* and Polaris's lexicography argument, during the claim construction hearing, Western Digital all but conceded the lexicography issue. (*See* Hr'g Tr. 73:6–74:8.) Instead, Western Digital asks the Court to use the full definition found in the specification, which includes the following sentence appended to the end of the definition: "[f]or example, the 'Gear 1' sections of Tables III, IV, and V, plus the Threshold G1, collectively define Gear 1." (*Id.*; Resp. Br. 21–22.) However, an example is not a definition, and the Court declines to include an example as part of its construction here. *See Alynlam Pharms.*, 138 F.4th at 1333 (affirming district court's construction that excised the example from the definition of "branched alkyl" in U.S. Patent No. 11,246,933).

For these reasons, the Court adopts Polaris's proposed construction in full.

**B. "Error correction coding (ECC) schemes" (Claims 1 & 15)**

**Disputed Term:** "Error correction coding (ECC) schemes" / "ECC Schemes"

| **Polaris's Construction** | **Western Digital's Construction** | **The Court's Construction** |
|---|---|---|
| An approach to applying ECC to encode data for storage and/or decode the encoded data to recover the original data. | An approach to applying ECC to encode data for storage and decode the encoded data to recover the original data. | An approach to applying ECC to encode data for storage and decode the encoded data to recover the original data. |

The ninth disputed term (and second disputed term of the '085 Patent) is "Error correction coding (ECC) schemes." While the term was originally disputed in full, the parties narrowed their dispute to one issue: the use of "and/or" versus "and." (*See* Pl.'s Notice, Dkt. No. 125.)

The dispute is fundamental. Polaris argues that the "or" is necessary because ECC schemes "can be used to store but need not be used to recover (even if capable of recovering), and vice versa." (Reply Br. 12; Hr'g Tr. 79:13–15 ("You have to be

capable of decoding but not require it every time you encode data.”).) Western Digital argues encoding and decoding are “two sides of the same coin,” and that “an ECC scheme [cannot] only be [a] storage side approach or only [a] recovery side approach.” (Hr’g Tr. 76:2–77:7; *see* Resp. Br. 23.) Thus, the dispute centers on whether an ECC scheme must always encode (storage of data) and decode (recovery of data), or whether it can do one while not doing the other.

The Court adopts Western Digital’s construction. First, including “or” in the construction invites confusion. Specifically, the “or” suggests that ECC schemes can be used to decode but not encode, a result that Polaris did not attempt to defend at the claim construction hearing and that finds no support in the ’085 Patent. Second, Polaris, in its opening brief, argues that ECC is used “both to encode *and to* decode.” (Opening Br. 24 (emphasis in original).) Polaris’s own proffered POSITA declares that ECC schemes “involves storing *and* recovering information.” (Berg Decl. ¶ 71 (emphasis added).) And Polaris even states that the definition for ECC “leaves no doubt that data recovery is *essential* to the definition.” (Opening Br. 24 (emphasis in original).) In light of these unequivocal statements, Polaris’s argument advanced at the claim construction hearing, that ECC schemes can encode while not decoding, rings hollow. Instead, the Court finds that simply using “and” most effectively communicates the position on which both parties agree and what a POSITA would understand: that ECC schemes is capable of encoding and decoding data.

For these reasons, the Court adopts Western Digital’s proposed construction in full.

## VI. CONCLUSION

For the reasons discussed above, the Court construes the disputed terms as follows:

| **’968 Patent** | |
|---|---|
| **Disputed Term** | **The Court’s Construction** |
| “A nonvolatile memory controller for alerting a host processing unit to an unprocessed completion status contained in a completion queue of the host processing unit, the nonvolatile memory controller comprising”<br>*(Claim 1)* | The preamble is not limiting other than the phrase “nonvolatile memory controller,” which should be given its plain and ordinary meaning. |
| “Interrupt Manager” / “Interrupt Manager Controller”<br>*(Claims 1, 6, 7, 8, 9, 10, 14, 15)* | Hardware and/or software within the nonvolatile memory controller for alerting the host processing unit to an unprocessed completion status. |
| “generate a completion queue state for indicating the occurrence of a completion queue event associated with the completion queue, generate an interrupt vector state based on the completion queue state, determine the completion queue of the host processing unit contains an unprocessed completion status based on the interrupt vector state, and generate an interrupt message packet for triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue . . .”<br>*(Body of Claim 1)* | Steps must be performed in order. |

| | |
|---|---|
| "map at least one completion queue state of the plurality of completion queue states to an interrupt vector state of the plurality of interrupt vector states, generate the interrupt vector state based on each completion queue state mapped to the interrupt vector state, determine a completion queue corresponding to a completion queue state mapped to the interrupt vector state contains an unprocessed completion status based on the interrupt vector state, and to generate an interrupt message packet based on the interrupt vector state for triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue."<br>*(Body of Claim 8)* | Steps must be performed in order. |
| "generating a completion queue state by a nonvolatile memory controller for indicating the occurrence of a completion queue event associated with a completion queue in a host processing unit, . . . generating an interrupt vector state by the nonvolatile memory controller based on the completion queue state, the interrupt vector state associated with an interrupt vector in the host processing unit; determining by the nonvolatile memory controller based on the interrupt vector state that the completion queue contains an unprocessed completion status; and generating an interrupt message packet by a nonvolatile memory interface for | Steps must be performed in order. |

| | |
|---|---|
| triggering an interrupt in the host processing unit to alert the host processing unit of the unprocessed completion status in the completion queue.”<br>*(Body of Claim 16)* | |
| **’085 Patent** | |
| **Disputed Term** | **The Court’s Construction** |
| “Gear”<br>*(Claims 1 & 15)* | Plain and ordinary meaning, which is a set of parameter(s) specifying an error correction coding scheme, including one or more of the payload capacity, the type and parameters of each component code, the interleaving scheme, and parameters used for determining whether the gear is appropriate for a particular situation. |
| “Error correction coding (ECC) schemes” / “ECC Schemes”<br>*(Claims 1 & 15)* | An approach to applying ECC to encode data for storage and decode the encoded data to recover the original data. |

**IT IS SO ORDERED.**

August 18, 2026

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**